## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | * | |
| OSPREY CONSULTING I, INC. d/b/a | * | |
| Centennial Surety Associates, Inc., *et al.,* | * | |
| | * | |
| Plaintiffs, | * | |
| v. | * | Civil Case No. SAG-19-03092 |
| | * | |
| WESTPORT INSURANCE CORP., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### <u>MEMORANDUM OPINION</u>

Plaintiffs Osprey Consulting I, Inc. d/b/a Centennial Surety Associates, Inc. ("Centennial") and Michael Schendel ("Schendel") (collectively, "Plaintiffs") filed an Amended Complaint against Westport Insurance Corporation ("Westport"), alleging claims for declaratory judgment, breach of contract, and bad faith.[1]  ECF 29.  Plaintiffs filed a Motion for Partial Summary Judgment, ECF 21, and Westport countered with a Cross-Motion for Summary Judgment, ECF 23.  I have reviewed those motions, along with the relevant oppositions and replies.  ECF 24, 26.  A telephonic hearing on the motions occurred on May 14, 2020.  For the reasons that follow, Plaintiffs' Motion for Summary Judgment will be granted in part as to Count Two, and the remaining portions of the parties' cross-motions will be denied, without prejudice. Westport will be afforded thirty days to file a counterclaim seeking a declaratory judgment as to its continuing duty to defend, if it wishes to do so.

---

[1] At the time this lawsuit was removed from state court to federal court, the Amended Complaint was inadvertently omitted from the removal paperwork, and it did not get filed formally until May 29, 2020.  ECF 27.  However, the parties have treated it as the operative pleading throughout the course of the litigation.  *Id.*

## I.      FACTUAL BACKGROUND

Plaintiff Centennial, a bonding agency located in Anne Arundel County, Maryland, issues construction bonds for contractors in the Mid-Atlantic region. ECF 21-2, ¶ 2 (Schendel Aff.). Plaintiff Schendel serves as Centennial's President. *Id.* During the time relevant to this case, Centennial maintained an Insurance Industry Professional Liability Coverage for Insurance Agencies policy ("the Policy"), policy number WED4MD005369009, with Westport. *Id.* ¶ 4; ECF 21-3. The Policy provided coverage in the amount of $2,000,000 per claim and $4,000,000 for the policy period. ECF 21-3 at 5, ¶ C. Specifically, the Policy provided that Westport:

> will pay on behalf of the INSURED all sums in excess of the DEDUCTIBLE that the INSURED becomes legally obligated to pay as DAMAGES caused by WRONGFUL ACTS resulting in any CLAIM first made against the INSURED during the POLICY PERIOD and reported in writing to [Westport] or the producing agent as soon as practicable.

*Id.* at 7 (§ I.A). Both Centennial and Schendel are deemed to be "INSUREDs" under the Policy. *Id.* at 11-12 (§§ IV.I.4–5).

In addition to claim coverage, the Policy also provided that Westport would "have the right and duty to defend, investigate, and conduct any settlement negotiations arising from any CLAIM first made against the INSURED during the POLICY PERIOD based upon alleged WRONGFUL ACTS of an INSURED." *Id.* at 9 (§ II.A). The Policy thereafter specified two conditions under which Westport would not be obligated to pay defense costs:

> [Westport] shall not be obligated to pay any DAMAGES or defend or continue to defend any CLAIM after the Per CLAIM Limit of Liability or Aggregate Limit of Liability under this POLICY has been exhausted by payment of DAMAGES or after the deposit in a court having jurisdiction of sums exhausting the Per CLAIM Limit of Liability or Aggregate Limit of Liability.

*Id.* (§ II).

As relevant here, the Policy defines "WRONGFUL ACT" as "any negligent act, error, or omission of an INSURED in rendering PROFESSIONAL SERVICES or OTHER RELATED SERVICES for others."   *Id.* at 14 (§ V.1).   "PROFESSIONAL SERVICES" is defined to include, *inter alia*:

1. [S]ervices rendered as a managing general insurance agent, general insurance agent, insurance agent or insurance broker;
2. [S]ervices rendered as an insurance consultant, including, but not limited to, insurance consulting connected with employee benefit plans;
3. [P]remium financing services provided by the NAMED INSURED to the NAMED INSURED's clients for insurance products placed through the NAMED INSURED's agency; [and]
4. [L]oss control, risk management, or anti-fraud services rendered in connection with insurance placed through the NAMED INSURED

*Id.* at 13-14 (§ IV.R).

Finally, the Policy contains a "FRAUDULENT ENTITY" exclusion, which provides:

This POLICY shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from . . . [o]r in connection with any FRAUDULENT ENTITY or any entity that the Insured knew or, if industry standard due diligence had been performed, reasonably should have known is a legally formed entity that is used as a device to commit fraud or other unlawful acts.

*Id.* at 15 (§ V.E); *id.* at 29 (Fraudulent Entity Policy Endorsement).

On August 6, 2014, plaintiff-relator Andrew Scollick ("Relator") filed a *qui tam* suit in the United States District Court for the District of Columbia (the "*Scollick* Litigation"), naming eighteen defendants, including Centennial and Schendel.   *See* Complaint, *United States ex rel. Scollick v. Narula*, Civil No. 1:14-cv-01339-RCL (D.D.C. filed Aug. 6, 2014), ECF 1 (attached to Westport's Cross-Motion as ECF 23-2) [hereinafter "the *Scollick* Complaint"]. The *Scollick* Complaint essentially alleged that Neil Parekh, Ajay K. Madan, and Vijay Narula, who serve as the officers of one construction company (OST), falsely certified two other companies (CSG and Citibuilders) as service-disabled veteran-owned small businesses ("SDVOSBs") for the purposes

of obtaining preferred treatment in government contracting that OST could not obtain. *See, e.g.*, *id.* ¶¶ 42-50; 107-28. In particular, those defendants identified service disabled veterans as the "owners" of CSG and Citibuilders, knowing that those veterans did not actually exercise ownership or control over those entities. *Id.*

CSG and Citibuilders had to obtain bid bonds and performance bonds to perform under their government contracts. *Id.* ¶¶ 148-51. According to the *Scollick* Complaint, Schendel had a longstanding relationship with Parekh, and knew that OST, CSG, and Citibuilders shared common ownership. *Id.* ¶¶ 154-55. Nevertheless, Schendel and Centennial arranged for bonds to be issued to CSG and Citibuilders, allowing those entities to submit claims to the government as SDVOSBs, when in fact they should not have qualified because the involvement of the service-disabled veterans was fraudulent. *Id.* ¶¶ 156-58, 162-63. Scollick, acting as a whistleblower, reported the alleged fraud to the government via his *qui tam* lawsuit.

Centennial and Schendel were served with the summons and complaint in the *Scollick* Litigation on July 16, 2015, and promptly provided a copy to Westport. ECF 21-2, ¶¶ 6, 8. On July 27, 2015, Westport Claims Representative John Nesbit advised Plaintiffs' counsel that Westport was in the process of reviewing the Complaint, to determine whether the claim would be covered by the Policy. *Id.* ¶ 9; ECF 21-5 (July, 2015 email chain between Schendel, Nesbit, and Mr. Jason Brino). Two days later, a new Westport claims representative, Ellen McCarthy, emailed Plaintiffs, "I wanted to let you know that I have been reassigned the handling of this matter. I am physically located in Anne Arundel County and have some experience with Qui Tam matters, both of which should be beneficial." ECF 21-2, ¶ 10; ECF 21-6 at 2. Then, on August 5, 2015, McCarthy emailed Westport's coverage position letter to Plaintiffs. ECF 21-7 at 1; *see* ECF 21-8 (the August 5 Letter). The email attaching the letter stated, "As we discussed on

4

Friday, Westport will provide a defense for the complaint subject to a reservation of rights.  Let's discuss what you wish to do with respect to counsel."  *Id.*; ECF 21-2, ¶ 11. Westport sent an amended coverage letter to Plaintiffs on August 18, 2015, in which it detailed the limits for Insurance Agents Professional Liability Miscellaneous Coverage under a second policy held by Plaintiffs, "the Excess Policy."[2]  ECF 21-10.  For ease of reference herein, the August 5 and August 18 letters are referred to collectively as the "Coverage Letter."  Following approximately six pages detailing various reasons Westport believes the Policy and the Excess Policy might not cover the claims in the *Scollick* Litigation, the Coverage Letter included the following "Reservation of Rights":

> As noted above, Westport reserves rights in this matter.  While we will agree to participate in your defense, we are doing so under a full reservation of rights, without admitting coverage or agreeing to indemnify you for any judgment involving a finding of act, error or omission which is not covered by your policy. Westport Insurance Corporation also reserves the right to file a declaratory relief action for the determination of its duty to defend and/or indemnify, including the right to request reimbursement for any defense costs or indemnity paid for uncovered claims.  Westport expressly reserves and does not waive its right to later seek reimbursement of all amounts paid by it with respect to claims for expenses, including attorney's fees, settlement, or judgment, in the event coverage under the Policy is found to be inapplicable or excluded.

ECF 21-10 at 7.

Westport provided a list of approved attorneys and firms to Plaintiffs, who selected Eccleston & Wolf, P.C. ("Eccleston") to represent them in the *Scollick* Litigation.  ECF 21-10 at 6; ECF 21-1, ¶ 13.  Eccleston filed a motion to dismiss the complaint in the *Scollick* Litigation as

---

[2] As the parties concede, the questions of coverage under the Policy and the Excess Policy are essentially identical, and the Court need not engage in separate analyses under the two policies. *See, e.g.,* ECF 21-1 n.16 ("The Insureds reject these highlighted statements as inaccurate, but cite to them for purposes of illustrating the identical nature of the analysis undertaken by Westport between the Primary Policy and the Excess Policy as concerns the nature of the claims at issue. For the same reasons a potentiality of coverage exists under the Primary Policy, a potentiality of coverage likewise exists under the Excess Policy.").

to Plaintiffs, and the motion was granted, because the Court found that the Relator (Scollick) had not adequately alleged facts establishing Plaintiffs' involvement in a scheme or conspiracy to violate the FCA.  ECF 21-2, ¶ 14.

However, Scollick filed a Motion for Leave to Amend on January 30, 2017.  ECF 21-2, ¶ 15.  On February 3, 2017, McCarthy emailed Schendel and an attorney for Plaintiffs, attaching the Motion for Leave to Amend and the proposed Amended Complaint.  *Id.* ¶ 16.  McCarthy wrote that Eccleston had advised Westport of the Relator's motion for leave to amend, and stated, "We plan to have a strategy in place soon.  Please note that if the court does allow the amended complaint to be filed, Westport would continue to handle this matter under a reservation of rights, as outlined in my August 18, 2015 letter."  *Id.*  The District Court eventually granted the Motion to Amend, and allowed the Amended Complaint to be filed, reasoning in part:

> Plaintiff-relator's Amended Complaint supplements the previously alleged facts with new details regarding the insurance defendants' knowledge.  It alleges that the insurance defendants "facilitated [the CSG and Citibuilders] fraud schemes by obtaining facts that the Bonding Defendants knew or should have known violated the government's contracting requirements, but the Bonding Defendants not only concealed those facts from the government, they also issued surety bonds to CSG and Citibuilders, which gave the misleading appearance that CSG and Citibuilders were qualified to bid on these SDVOSB construction contracts." [Am. Compl.] ¶ 198.  Specifically, the Amended Complaint sufficiently alleges that the insurance defendants knew or should have known that CSG and Citibuilders were violating the government's contracting requirements by alleging that the insurance defendants engaged in an underwriting process during which they conducted an on-site inspection of OST's offices.  *Id.* ¶ 176.  After this tour, the insurance defendants "necessarily understood that CSG was a shell company dependent on the resources and capabilities and capital of CB and OST and the experience and knowledge and financial backing or Parekh, Narula, and Madan," and the underwriting and due diligence "would reasonably have revealed that CSG did not possess the necessary construction history or financial capabilities to carry out the scope of the contracting activity ultimately undertaken in the name of CSG."  *Id.* ¶¶ 177-78.  The Amended Complaint further alleges that the underwriting and due diligence reasonably led to the conclusions that "Parekh, Narula, and Madan exerted dominance and control over CGS," that "Gogia lacked the skill,

knowledge, resources and past performance to engage in the scope of contracting activity undertaken by the CSG conspirators," and that "CSG was not a service-disabled small business operating out of Harrisonburg." *Id.* ¶¶ 180-82. It also alleges that "[t]he underwriting and due diligence by the Bonding Defendants to provide bonding to Citibuilders would have revealed that Goodweather was not in control of that entity and that Citibuilders constitutes a separate shell company Parekh established for the purpose of obtaining SDVOSB contracts." *Id.* ¶ 194. These allegations go beyond those in the original Complaint regarding knowledge of CGS's and Citibuilders' ownership and control. They are now sufficient to allege that the insurance defendants had knowledge of CSG's and Citibuilders' fraud, *i.e.,* that they were fraudulently asserting status as SDVOSBs.

*United States ex rel. Scollick v. Narula*, No. 14-cv-01339-RCL, 2017 WL 3268857, at *14 (D.D.C. July 31, 2017). The Court thus permitted the case to proceed against Plaintiffs on a theory indirect presentment of false claims under the FCA, including but not limited to a conspiracy count. *Id.* at *15.

Months later, on October 19, 2017, with Westport still paying defense costs under a reservation of rights, Plaintiffs filed their Answer to the Amended Complaint, in which they asserted various defenses, including their lack of knowledge that the claims made by CSG and Citibuilders were fraudulent. ECF 21-20. On November 20, 2017, after Eccleston filed Plaintiffs' Answer to the Amended Complaint in the *Scollick* Litigation, McCarthy again emailed Schendel to state,

> As you know, the court is allowing the case to proceed against Centennial under the following counts – Count I, Presentment of False Claims; Count II, Making False Statements; and Count IV, Conspiracy. This is to confirm the [sic] Westport will continue to reserve rights in this matter as outlined in our August 18, 2015 letter.

ECF 21-2, ¶ 18; ECF 21-12 at 1. Plaintiffs engaged in discovery in the *Scollick* Litigation through Eccleston, who was paid by Westport. ECF 21-2, ¶¶ 19-20.

Almost two years later, on July 29, 2019, Westport sent a letter ("the Denial Letter") to Plaintiffs which read, in relevant part, "As set forth in greater detail below, after carefully

reviewing this matter in conjunction with the terms and conditions of the subject insurance policies, we regret to inform you that the Policies do not afford coverage for the matter."  ECF 21-2, ¶ 21; ECF 21-14.  Westport premised its decision on four points: (1) the fact that the Amended Complaint does not allege a "WRONGFUL ACT" because the conduct alleged is intentional, not negligent; (2) the fact that the Amended Complaint does not allege Plaintiffs were providing "PROFESSIONAL SERVICES," (3) the "FRAUDULENT ENTITY" exclusion bars coverage; and (4) the Amended Complaint does not allege a "personal and advertising injury" under the Excess Policy.  ECF 21-14 at 6-7.  Plaintiffs continued to pay Eccleston directly to defend the *Scollick* Litigation.  ECF 21-2, ¶ 23.  However, this lawsuit followed, and Plaintiffs seek relief in three forms: a declaratory judgment that Westport must provide a defense in the *Scollick* Litigation, damages for Westport's alleged breach of the Policy, and damages for Westport's alleged bad faith withdrawal of the defense.  ECF 29, ¶¶ 36-71.

## II.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of

evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III. ANALYSIS

Plaintiffs seek partial summary judgment as to Counts I and II, on the issue of liability only. ECF 21. Specifically, they ask this Court to declare "that Defendant Westport Insurance Corporation has an ongoing duty to defend its Insureds in the Scollick Litigation," and to grant "judgment for the Plaintiffs and against Westport in the instant action on the Plaintiffs' Breach of Contract Claim," leaving damages, and an evaluation of Plaintiffs' bad faith claim, to be determined at a later date. ECF 21 at 4. In contrast, Westport asks the Court to grant

"Westport's Cross-Motion for Summary Judgment and dismiss[] the complaint against Westport with prejudice." ECF 23 at 3. Because, for the reasons described below, Westport breached its contract with Plaintiffs by withdrawing from its voluntarily assumed duty to defend, without seeking a declaratory judgment that such withdrawal is appropriate, this Court will decline to address the merits of the parties' respective claims about coverage, until Westport has either sought a declaratory judgment or manifested its intent not to do so.

Maryland law treats insurance policies the same as any contract, and does not require that insurance policies "be construed most strongly against the insurer." *Catalina Enters., Inc. Pension Tr. v. Hartford Fire Ins. Co.*, 67 F.3d 63, 65 (4th Cir. 1995) (citing *Collier v. MD–Individual Practice Ass'n*, 327 Md. 1, 5 (1992)). Instead, Maryland courts must construe the policy as a whole in order to ascertain the parties' intent. *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 766-67 (1989). But "where a contract is plain and unambiguous, there is no room for construction." *Bd. of Trs. of State Colls. v. Sherman*, 280 Md. 373, 380 (1977). When looking at the policy's text, courts must "accord words their ordinary and accepted meanings," or that meaning which "a reasonable person would attach to the term," *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985), absent evidence of the parties' intent to employ the term in question "in a special or technical sense," *Cheney*, 315 Md. at 766. The parties' intent can also be derived from "the character of the contract, its object and purposes, and the factual circumstances of the parties at the time of execution." *Catalina*, 67 F.3d at 65 (citing *Collier*, 327 Md. at 5). Courts may determine questions of interpretation of a policy provision as a matter of law, so long as (1) the provision's text is unambiguous, or (2) if the text is ambiguous, "if there is no factual dispute in the evidence." *Pac. Indem.*, 302 Md. at 389.

Also relevant here, even where an insurance policy provides an insurer with certain rights, the doctrine of waiver can work to deprive the insurer of its ability to invoke that right at a later time. *See GEICO v. Medical Services,* 322 Md. 645, 650 (1991). As the Court of Appeals of Maryland has explained:

> Waiver, in general, is "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances.' *Food Fair v. Blumberg*, 234 Md. 521, 531, 200 A.2d 166 (1964) (citations omitted). In insurance law, waiver requires "'an actual intention to relinquish an existing right, benefit, or advantage, with knowledge, either actual or constructive, of its existence, or such conduct as to warrant an inference of such intention to relinquish.'"

*Creveling v. Government Employees Ins. Co.*, 376 Md. 72, 96-98 (2003). The intent to waive a certain right can be inferred from the insurer's conduct, "if the conduct is 'inconsistent with an intention to insist upon a strict performance of the condition.'" *Allstate Ins. Co. v. Reliance Ins. Co.*, 141 Md. App. 506, 514 (2001) (quoting *St. Paul Fire & Marine Ins. Co. v. Molloy*, 291 Md. 139, 145 (1981)). While typically a question of fact, waiver can be decided as a matter of law "where the facts in making the determination of whether waiver . . . exist[s] *vel non* are clear." *Maynard v. Westport Ins. Corp.*, 208 F. Supp. 2d 568, 576 n.7 (D. Md. 2002) (citing *Allstate*, 141 Md. App. at 515-16; *St. Paul Fire*, 291 Md. at 145); *see also Woznicki v. GEICO Gen. Ins. Co.*, 443 Md. 93, 119 (2015) ("In some instances, however, the waiver, or lack thereof, may be so apparent that a court can make a determination as a matter of law.").

With these principles in mind, the Court begins by determining the extent of Westport's rights under the Policy. Notably, Plaintiffs do not argue that Westport had *no* authority to challenge its continuing duty to defend Plaintiffs after having voluntarily assumed the duty; rather, Plaintiffs argue that Westport was required, under the terms of the Policy and the Coverage Letter, to seek a declaratory judgment action in order to withdraw from that duty. *See*

ECF 21-1 at 28-32; ECF 24 at 20-23.  Thus, the salient question before the Court is whether Westport had, and/or reserved, the right to withdraw from its duty to defend Plaintiffs in the *Scollick* Litigation, by any means that Westport might choose.

This analysis starts, as it must, with the Policy's terms.  The Policy itself unambiguously provides no such right to Westport to unilaterally withdraw from an assumed duty to defend. Indeed, Section II of the Policy only recognizes that Westport "shall not be obligated to . . . continue to defend any CLAIM" if the Per CLAIM Limit of Liability, or Aggregate Limit of Liability, are exhausted through one of two means.  ECF 21-3 at 9.  Westport has made no argument that any CLAIM Limit was reached so as to justify automatic withdrawal.

Instead, both parties assert that the operative language is found in the Coverage Letter Westport sent to Plaintiffs, describing its intent with respect to fulfillment of its obligations under the Policy.  Plaintiffs, as noted above, construe the Coverage Letter as Westport reserving *only* the right to challenge its duty to defend through the initiation of a declaratory judgment action.  *E.g.*, ECF 21-1 at 28-32.  Westport, however, construes the Coverage Letter as reserving *all* rights it may have with regards to challenging its assumed duty to defend.  *E.g.*, ECF 23-1 at 29-35.  As a matter of law, this Court finds that Plaintiffs' interpretation is consistent with the Coverage Letter's unambiguous terms.

Initially, the Coverage Letter contains a series of contentions regarding the ultimate question of whether coverage will be available under the Policy, and "reserves all rights" with respect to each of those individual coverage questions.  *See* ECF 21-10 at 3 (whether the Complaint alleges a "Wrongful Act"); *id.* at 5 (whether the fraudulent entity exclusion applies); *id.* at 6 (whether the *Scollick* complaint alleges a personal and advertising injury).  Westport is correct that, with respect to these provisions, it adequately reserved its ability to raise these

issues, if it later challenged its duty to continue defending Plaintiffs.  ECF 23-1 at 29-30.  But again, the relevant question in the instant posture is not the overall scope of coverage for indemnification under the Policy, or even whether Westport actually *had* a duty to defend Plaintiffs in the *Scollick* Litigation, but what means Westport made available to itself to challenge its voluntarily-assumed duty to defend.

The Coverage Letter includes several express references to the duty to defend.  On page 6 of the Coverage Letter, Westport says, "Subject to, and not waiving any rights, Westport **will provide a defense under the policy**."  ECF 21-10 at 6 (emphasis added).  On page 7, in a summary paragraph, Westport adds:

> As noted above, Westport reserves rights in this matter.  While **we will agree to participate in your defense**, we are doing so under a full reservation of rights, without admitting coverage or agreeing to indemnify you for any judgment involving a finding of act, error or omission which is not covered by your policy. **Westport Insurance Corporation also reserves the right to file a declaratory relief action for the determination of its duty to defend and/or indemnify, including the right to request reimbursement for any defense costs or indemnity paid for uncovered claims.**  Westport expressly reserves and does not waive its right to later seek reimbursement of all amounts paid by it with respect to claims for expenses, including attorney's fees, settlement, or judgment, in the event coverage under the Policy is found to be inapplicable or excluded.

*Id.* at 7 (emphasis added).  Parsing this largely unambiguous language, with a focus on the duty to defend, the second sentence, regarding Westport's "full reservation of rights," emphasizes the ultimate scope of indemnification coverage:  Westport again expresses its agreement to participate in the defense of the *Scollick* Litigation, but clarifies that it is not agreeing to indemnify Plaintiffs for any judgment other than those properly covered under the Policy. Similarly, the last sentence of this summary paragraph appears to refer to indemnification coverage, and Westport's right to seek reimbursement following a proceeding at which "coverage under the Policy is found to be inapplicable or excluded."  *Id.*

In essence, only one sentence in the summary paragraph makes reference to Westport's voluntarily-assumed duty to defend:  "Westport Insurance Corporation also reserves the **right to file a declaratory relief action for the determination of its duty to defend** and/or indemnify, including the right to request reimbursement for any defense costs or indemnity paid for uncovered claims."  *Id.* (emphasis added).  Considering this unambiguous language, the Court finds that the Coverage Letter – authored solely by Westport – demonstrates that Westport only intended to exercise its contractual right to challenge its voluntarily-assumed duty to defend through the institution of a declaratory judgment action.  Westport effectively waived its right to contest its duty to defend, except on those specific, unambiguous terms reserved in the Coverage Letter.  Indeed, if Westport already had the right to change its mind unilaterally and terminate payment of defense costs, it would have no reason to reserve only a right to "file a declaratory relief action for the determination of its duty to defend."

Westport further contends that its repeated references to a "full reservation of rights," and that it "reserves all rights," means that it implicitly reserved the right to withdraw its defense without seeking a declaratory judgment, despite its express language reserving the right to file a declaratory relief action for that precise purpose.  ECF 23-1 at 26-27.  This argument has two fatal flaws.

First, as noted above, there is no language in the Policy itself purporting to create a unilateral right to withdraw from an assumed defense of Plaintiffs, except under the limited circumstance in which a Coverage Limit is reached.  ECF 21-3 at 9 (§ II).  Thus, without any supporting language from the Policy, Westport's argument inherently relies on the existence of a "right" to unilateral withdrawal inherent in every insurance contract as a matter of Maryland common law.  In support of this notion, Westport cites to two cases, *Liberty Mutual Ins. Co. v.*

*Triangle Industries, Inc.,* 957 F.2d 1153 (4th Cir. 1992), and *Wolfe v. Anne Arundel County,* 135 Md. App. 1 (2000). *See* ECF 23-1 at 31. But neither of those cases conclusively establishes that a Maryland insurer retains the general right, outside of the context of a declaratory judgment action, to withdraw from a defense it had undertaken. *See Liberty Mut. Ins. Co.,* 957 F.2d at 1160 (applying New Jersey law and upholding a determination, *in a declaratory judgment action,* that insurance company could withdraw a defense before trial); *Wolfe,* 135 Md. App. at 19-20 (distinguishing between the duty to defend and the duty to indemnify, and allowing the self-insured county to deny indemnity coverage once liability had been determined, even after defending the litigation under a reservation of rights).

To be sure, the corresponding cases cited by Plaintiffs do not conclusively establish that Maryland requires an insurer to obtain a declaratory judgment in order to withdraw a defense after agreeing to defend under a reservation of rights. However, Plaintiffs' cited cases are more apposite than Westport's, in that they at least suggest that a declaratory judgment must be sought before an insurer can withdraw a defense while the underlying action is pending. *See, e.g.,* *Applied Signal & Image Tech., Inc. v. Harleysville Mut. Ins. Co.,* 252 F. Supp. 2d 215, 219 (D. Md. 2003) ("Moreover, if Harleysville had determined that it had no duty to indemnify ASIT while the Hejl suit was pending, Harleysville had a right to seek a declaratory action stating that it no longer had a duty to defend or indemnify. It failed to do so. Harleysville is not now entitled to unilaterally withdraw its defense by refusing to pay ASIT's defense fees."); *Harford Mut. Ins. Co. v. Jacobson,* 73 Md. App. 670, 678-79 (1988) ("We are not saying that upon discovering sufficient evidence that the policy did not cover the alleged occurrence Harford necessarily had no option but to continue to defend the insured. When a dispute over coverage arises during the course of a pending tort suit, that question can be determined by a trial court in

15

a declaratory judgment action. . . .  In the case *sub judice*, [Harford] unilaterally determined that it had no duty to defend [Jacobson] and withdrew from the case.  This was not appropriate and [Harford] must expect to be held accountable for its actions.").

In sum, there is no Maryland law establishing an insurer's right to unilaterally withdraw an ongoing defense, once it undertakes a duty to defend.  But, *Applied Signal* and *Jacobson* lend great weight to the view that Maryland courts tend towards requiring a declaratory judgment before a defense can be withdrawn by an insurer, in circumstances like those present in the instant case.  And if no such right existed, Westport's argument that its boilerplate language purporting to generally reserve "all rights" would not support the notion that it had a right to unilaterally withdraw from its defense of Plaintiffs in the *Scollick* Litigation.  *See, e.g.*, *Am. Modern Home Ins. Co. v. Reeds at Bayview Mobile Home Park, LLC*, 176 F. App'x 363, 367 (4th Cir. 2006) ("Assiduous reservation of a non-existent right does not bring that right into existence.").

Ultimately, this Court need not definitively reach the issue, because Westport's argument suffers from a second fatal flaw.  Even if one were to assume that Maryland common law permits an insurer to withdraw from its voluntarily-assumed duty to defend, without first seeking a court order, there is no language in the Coverage Letter to support the notion that Westport reserved this right.  Again, the relevant language is found in the previously discussed summary paragraph on page 7 of the Coverage Letter.  The paragraph begins, "As noted above, Westport reserves rights in this matter."  ECF 21-10 at 7.  This sentence merely reaffirms the reservation of rights made in the preceding pages, regarding the various policy provisions that may allow Westport to deny coverage for Plaintiffs' liability in the *Scollick* Litigation.  The second sentence reaffirms this sentiment, in the context of Westport's voluntary assumption of the duty to defend:

"While we will agree to participate in your defense, we are doing so under a full reservation of rights, without admitting coverage or agreeing to indemnify you for any judgment involving a finding of act, error or omission which is not covered by your policy." *Id.*  As discussed above, this sentence only pertains to Westport's reservation of rights vis-à-vis its ultimate coverage responsibility, and its duty to indemnify Plaintiffs (which are, essentially, one in the same).  This reading is further bolstered by the third sentence, which distinguishes itself from the previous reservation of rights regarding coverage, by saying that Westport "*also reserves* the right to file a declaratory relief action for the determination of its duty to defend and/or indemnify."  ECF 23-1 at 7 (emphasis added).  In other words, Westport did not view its "full reservation of rights" in the second sentence to have covered any rights it may have had to challenge its assumed duty to defend, and therefore added this third sentence as a means of doing so.  But the third sentence does not encompass a right to withdraw from defending Plaintiffs, without a court order.

The only textually feasible way for Westport's "full reservation of rights" in the second sentence to apply to its ability to challenge its assumed duty to defend is to find that the phrase "without admitting coverage" encompasses the notion that Westport does not admit that it has a duty to defend Plaintiffs in the first instance.  Such a reading, however, is precluded by Maryland law.  Maryland courts have made clear that the duty to defend is separate and distinct from the issue of coverage.  *See, e.g.*, *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 408 (1975) (explaining that the duty to defend is governed not by the policy's language, but by the language of the claim asserted against the insured; "it is irrelevant that the insurer may get information . . . which indicates, or even demonstrates, that the injury is not in fact 'covered'" (quoting *Lee v. Aetna Cas. & Sur. Co.*, 178 F.2d 750, 751-52 (2d Cir. 1949) (Hand, C.J.))); *see also Haines v. St. Paul Fire & Marine Ins. Co.*, 428 F. Supp. 435, 439 (D. Md. 1977) ("The duty to defend is

separate and distinct from, and not dependent upon, [the insurance company's] liability to pay, despite the fact that the two are ultimately related because they are dependent upon the basic scope of coverage under the policy."). Thus, the only language in the Coverage Letter that touches on Westport's ability to challenge its assumed duty to defend are the final two sentences of the summary paragraph, which, as described above, only preserve Westport's ability to withdraw from its duty to defend through a declaratory judgment action.

Accordingly, Westport's argument that the Coverage Letter reserved "all rights," including any theoretical right to unilaterally withdraw from an assumed defense under Maryland common law, fails, because the plain, unambiguous language of the Coverage Letter is inconsistent with any intent by Westport to reserve that right. *Compare with, e.g.*, *Humane Soc. of the U.S. v. Nat'l Union Fire Ins. Co.*, No. DKC-13-1822, 2015 WL 4616818, at *5 (D. Md. July 30, 2015) (finding that an insurance company, National Union, did not waive the right to later assert defenses not previously asserted in its coverage denial letter, because the letter provided, "National Union expressly reserves all of its rights under the policy, *including the right to assert additional defenses to any claims for coverage*" (emphasis partially omitted)); *Maynard*, 208 F. Supp. 2d at 576-77 (finding that Westport, in an unrelated case, did not waive its right to exclude coverage based on a policy exclusion, because letters that it sent to the insured prior to its ultimate coverage denial letter explicitly stated that it would likely deny coverage based on the exclusion at issue); *Molloy*, 291 Md. at 143-44, 146 (finding no intent to waive an arson defense to coverage under a fire insurance policy, where the insurance company previously asserted its intent to deny coverage "by reason of the neglect of the insured to use all reasonable means to save and preserve the property at and after the loss," because arson was

encompassed by the asserted defense).  Without any other evidence to the contrary, Westport has failed to create a genuine issue of material fact as to its waiver of that right.

Westport finally contends that the ultimate issue of whether the Policy provides coverage for Plaintiffs' defense in the *Scollick* Litigation must be determined now, because Plaintiffs "cannot simply waive into coverage that did not exist."  ECF 23-1 at 32.  To be sure, "[i]nsurance coverage cannot be established by waiver" under Maryland law.  *Gov't Emps. Ins. Co. v. Grp. Hospitalization Med. Servs., Inc.*, 322 Md. 645, 650 (1991) (emphasis omitted) (quoting *Aetna Cas. & Sur. Co. v. Urner*, 264 Md. 660, 668 (1972)).  On the other hand, "[i]t is well recognized that an insurer may, by its conduct, be deemed to have waived a condition of its policy."  *Id.* (quoting *A/C Elec. Co. v. Aetna Ins. Co.*, 251 Md. 410, 419 (1968)).  While the line between the two "can be hard to draw," the Maryland Court of Appeals has explained that a provision relates to "coverage" if it "relates to the scope of the risks to be covered (either by inclusion or exclusion) or to the dollar amount of coverage."  *Creveling*, 376 Md. at 98 (quoting *Wright v. Newman*, 598 F. Supp. 1178, 1198 (W.D. Mo. 1984)).  Provisions that may be waived – ones that the Court of Appeals has referred to as "forfeiture clauses" – are ones that "are invoked to avoid liability for existing coverage."  *Id.* at 99.

Here, Westport's argument, in the context of Westport's duty to defend its insured, is unpersuasive.  Preliminarily, the specific right Westport waived in the Coverage Letter, its right to unilaterally withdraw from its defense, bears no relation to the scope of the risks covered, or the total dollar amount of coverage, under the Policy between Plaintiffs and Westport.  *See Ryan v. 21st Century Centennial Ins. Co.*, No. TDC-15-3052, 2016 WL 3647612, at *6-9 (D. Md. June 30, 2016) (rejecting a defendant-insurance company's argument that the court was expanding "coverage" by applying the doctrine of estoppel to bar it from relying on a requirement in the

plaintiff-insured's policy to first obtain a judgment against an underinsured or uninsured motorist before directly initiating suit against the defendant-insurance company, because the provision bore no relation to the scope of the risks covered or the dollar amount of coverage).  Instead, the means by which Westport can challenge its ongoing duty to defend are merely ones used to *avoid* that ongoing duty.

Even looking at the duty to defend generally, given the expansive nature of an insurer's duty to defend under Maryland law, this Court's limited ruling does not act to expand the scope of the risks to be covered or "the dollar amount of coverage" under the Policy.  *See, e.g., Applied Signal*, 252 F. Supp. 2d at 219 n.5 ("Harleysville's argument that it cannot create coverage by waiver is inapposite.  That argument may be relevant to the duty to indemnify, but is not relevant to the duty to defend."); *Haines*, 428 F. Supp. at 439.  The Policy itself still determines whether there is a duty to indemnify, i.e., whether Centennial and Schendel's liability for damages in the *Scollick* Litigation is covered by the Policy.  But the duty to defend is essentially a "policy plus" inquiry, requiring the insurance company to pay defense costs even where there is only a minimal chance of coverage.  *See Sheets v. Brethren Mut. Ins. Co.,* 342 Md. 634, 643 (1996) (holding that the duty to defend arises for any "action that is *potentially* covered by the policy, no matter how attenuated, frivolous, or illogical that allegation may be" (emphasis added)); *see also Brohawn*, 276 Md. at 408.  An insurer may decide, for any number of reasons, to waive its right to deny coverage unilaterally at the outset, and to undertake the defense of its insured, when it perceives that its broad contractual obligation to defend might be a close call.  In this instance, this Court is simply upholding Westport's own interpretation of its contractual agreement with Plaintiffs, which requires it to obtain a judicial determination that potentiality is lacking in order

to cease its defense of Plaintiffs.  Such a ruling does not permit Plaintiffs to "waive into coverage that did not exist."

Thus, the Court's inquiry, given the current state of the pleadings, is appropriately focused only on the actual scope of Westport's waiver under the Coverage Letter.  A premature ruling on the actual scope of Westport's duty to defend, as it relates to the *Scollick* Litigation, outside of the context of an appropriate declaratory judgment action filed by Westport, could create a procedural morass for this Court and the parties.

Accordingly, summary judgment as to liability for breach of contract (Count II of the Amended Complaint) is appropriate for Plaintiffs, on the limited question of Westport's withdrawal of the defense without first seeking a declaratory judgment.  This Court will deny the remainder of the parties' dispositive motions, without prejudice, and will allow Westport the opportunity to seek leave to file a counterclaim, specifically a declaratory judgment that it (1) has no duty to defend Plaintiffs in the *Scollick* Litigation, and (2) therefore should be permitted to terminate the defense it undertook.  If such a counterclaim is allowed and eventually filed, the Court can proceed to evaluate the parties' respective coverage positions, in a procedural posture that could allow for greater finality. If Westport declines to file a declaratory judgment action, or if the Court denies leave to file upon review of the parties' submissions, the parties will be free to refile their dispositive motions for prompt adjudication.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment, ECF 21, will be GRANTED, in part, as to liability for Count Two, because Westport breached its contract with Plaintiffs by withdrawing its defense without first seeking a declaratory judgment. The remainder of the parties' cross-motions, ECF 21 and 23, will be DENIED without prejudice.

Within thirty days of the date of this Memorandum Opinion and accompanying Order, Westport may seek leave to file a Counterclaim seeking a declaratory judgment as to its duty to defend, and Plaintiffs will be allowed an opportunity to respond to that motion.  If no such Counterclaim is filed, or if the Court denies leave to file the Counterclaim after reviewing the relevant briefing, the parties will be given an opportunity to refile their pending dispositive motions, with any supplementation they believe appropriate.  If a Counterclaim is allowed and filed, the Court will set up a scheduling conference with the parties to discuss the appropriate next steps in the litigation.  A separate Order follows.


Dated:  June 10, 2020                                    _____/s/_____
                                                         Stephanie A. Gallagher
                                                         United States District Judge